FRANK H. CHESLEY *vs*. NANTASKET BEACH STEAMBOAT
COMPANY.

Suffolk.   March 21, 1901. — September 4, 1901.

Present: HOLMES, C. J., MORTON, LATHROP, BARKER, & LORING, JJ.

*Negligence*, Collision of vessels, Violation of statutory regulations, Contributory.   *Ship*,
Regulations in case of fog.   *Agency*, Scope of authority.

In an action against a steamboat company to recover for injuries alleged to have
been received from a steamboat of the defendant running down the plaintiff's
fishing boat while at anchor, it appeared, that the plaintiff's boat was a fourteen-
foot boat propelled by oars, that the plaintiff and a companion anchored their
boat close to the outer edge of the channel in Hull Gut in Boston harbor, and
began to fish; that there was fog or haze in the Gut at the time; that the
defendant's steamboat coming through the Gut on its regular trip when not far
distant from its landing place at Hull came into collision with the plaintiff's boat
or passed so near it as to cause the plaintiff to jump out and receive the injuries
complained of; that the steamer was running at a low rate of speed and was
giving the signals and warning prescribed by the United States statutory regu-
lations in case of fog; and that the plaintiff gave no signal and had no means on
board his boat of giving any signal.   The regulations provide that in fog or
mist, whether by day or night, a vessel when at anchor shall, at intervals of
not more than one minute, ring the bell rapidly for about five seconds, and
another provision requires, that "All rafts or other water craft, not herein pro-
vided for, navigating by hand power, horse power, or by the current of the
river, shall sound a blast of the fog-horn, or equivalent signal, at intervals of
not more than one minute."   *Held*, that on all the evidence the plaintiff was
not entitled to recover, as it was impossible to say that his violation of the
statutory regulation by his lack of signals did not contribute to the accident.
*Semble, also*, that the plaintiff was negligent in anchoring his boat in an improper
place and in doing nothing when he saw the steamboat coming, he having made
no effort to cut his anchor rope or to row out of danger, and that it could not
be said that anchoring his boat in an improper place did not contribute to the
collision.

The statutory regulations enacted by Congress to prevent collision of vessels are
to be interpreted in the same way in the common law courts of a State as they
are in the courts of the United States, if the action is for a maritime tort com-
mitted upon navigable waters within the admiralty jurisdiction of the United
States.   These are not mere prudential regulations, but binding enactments;
and, when a vessel has committed a positive breach of statute, she must show,
not only that her fault probably did not contribute to the disaster, but that it
could not have done so.

In an action against a steamboat company for injuries caused by a steamboat of
the defendant coming into collision in a fog with a boat in which the plaintiff
was fishing anchored close to the edge of the channel through a certain gut
which was part of the steamer's regular course, there was evidence of a conver-

sation between the plaintiff and a wharfinger of the defendant who was on his way to strike a triangle on a point of land for the purpose of guiding the steamboat in the fog. A man in the boat with the plaintiff testified, that the plaintiff cried out to the wharfinger "Are we all right here?" and that the wharfinger said "Yes." The wharfinger testified, that the plaintiff cried out "Do you think they can see us?" and that he replied "that he thought they could, but they would n't expect anybody anchored right in the Gut." *Held*, that, whatever the conversation was, there was nothing in it which could bind the defendant, there being nothing to show that the wharfinger could give any authority to any one to anchor in the path of the approaching steamboat, or that the plaintiff had a right to rely on the wharfinger's opinion as to whether his boat could be seen.

Tort to recover for injuries alleged to have been received by the plaintiff from a steamboat of the defendant. Writ dated September 16, 1898.

At the trial in the Superior Court, before *Sherman*, J., the jury returned a verdict for the plaintiff in the sum of $3,000; and the defendant alleged exceptions.

The defendant's first, third and sixth requests for rulings, which were refused by the judge, and which the court now holds should have been given, were as follows: 1. Upon all the evidence the plaintiff is not entitled to recover. 3. Unless the plaintiff, directly before and up to the time of the accident, sounded a fog horn or equivalent signal at intervals of not more than one minute, he was at fault and cannot recover. 6. Unless the jury find that the failure of the plaintiff to give the required fog signals could not have contributed to the accident, the plaintiff is not entitled to recover.

The instructions given by the judge are made immaterial by the decision of the court.

*R. W. Nason*, for the defendant.

*W. H. Baker*, for the plaintiff.

Lathrop, J. The essential facts in this case may be briefly stated. On July 30, 1898, at a quarter past seven in the morning, the plaintiff and one Schlimper went out fishing in a fourteen-foot boat propelled by oars, in that part of Boston Harbor known as Hull Gut. They anchored their boat close to the outside edge of the channel, at a point estimated by different witnesses as from seventy to two hundred feet from the shore, and began to fish. There was fog or haze in the Gut at the time. The defendant's steamboat Governor Andrew, coming through the Gut on its regular trip from Boston to Pemberton and Nan-

tasket, and when not far distant from the wharf at Pemberton either came into collision with the plaintiff's boat or passed so near it, that the plaintiff and his companion jumped into the water, and the plaintiff received the injuries complained of. The steamboat was going at a low rate of speed and was giving the signals and warning prescribed by the regulations in case of fog, and the plaintiff gave no signal, and had no means of giving any signal on board his boat.

The plaintiff lived on an island near by; was entirely familiar with the locality, and had been captain of one vessel and mate of another. Why he should anchor in a small rowboat close to the edge of the channel where he knew the steamboat must go, is not easy to ascertain. The U. S. St. of June 7, 1897, being c. 4, of the acts of that year, was put in evidence by the plaintiff and applies to this case, the place where the accident .occurred being an inland water connected with the high seas. Article 15 provides: " In fog, mist, falling snow, or heavy rain-storms, whether by day or night, the signals described in this article shall be used as follows, namely." Then follow various provisions for vessels under way and at anchor, and among them is this one: " A vessel when at anchor shall, at intervals, of not more than one minute, ring the bell rapidly for about five seconds." There is another provision which reads as follows: "·All rafts or other water craft, not herein provided for, navigating by hand power, horse power, or by the current of the river, shall sound a blast of the fog-horn, or equivalent signal, at intervals of not more than one minute."

There can be no doubt that the statutory regulations enacted by Congress to prevent collisions are to be interpreted in the same way in the common law courts of a State as they are in the courts of the United States, if the action is for a maritime tort committed upon navigable waters, within the admiralty jurisdiction of the United States; and that the judgment of the State court may be revised by the Supreme Court of the United States. *Belden* v. *Chase*, 150 U. S. 674, 691.

The rules enacted by Congress, or by supervising inspectors, authorized by Congress to establish rules, are, in the language of Chief Justice Fuller, in *Belden* v. *Chase*, " not mere prudential regulations, but binding enactments, obligatory from the

time that the necessity for precaution begins, and continuing so long as the means and opportunity to avoid the danger remains." 150 U. S. 674, 698.  So also it was said : "And it is the settled rule in this court that when a vessel has committed a positive breach of statute, she must show not only that probably her fault did not contribute to the disaster, but that it could not have done so." 150 U. S. 699.  See also *The Pennsylvania*, 19 Wall. 125, 126 ; *The Martello*, 153 U. S. 64 ; *The Britannia*, 153 U. S. 130, 143 ; *The H. F. Dimock*, 77 Fed. Rep. 226, 230, and 23 C. C. A. 123 ; *The Glendale*, 81 Fed. Rep. 633, 640 ; *Donnell* v. *Boston Tow Boat Co.* 89 Fed. Rep. 757, 762; *The Benjamin A. Van Brunt*, 98 Fed. Rep. 131 ; *The Providence*, 98 Fed. Rep. 133.

In *Belden* v. *Chase, ubi supra*, the judgment of the court below was reversed for the reason among others that the judge who charged the jury left it to them to decide whether those who were in the management of the respective boats were guilty of negligence or not, and whether or not they did or omitted to do that which persons of ordinary care ought to have done, and thereby, to quote the language of Chief Justice Fuller, "the obligatory force of the rules of navigation was substantially ignored." 150 U. S. 702, 703.

It is very clear that if the case at bar should have been submitted to the jury it should have gone to them under instructions very different from those which were given.  The instructions given were open to the same objections as those pointed out in *Belden* v. *Chase, ubi supra*.  It is also clear that the sixth request should have been given.  But we are of opinion that upon all the evidence the plaintiff was not entitled to recover, and that the first request should have been given.  There is no conflict of evidence upon the question whether there was a fog or haze.  The only conflict is upon the question of the density of the fog.  But the rule which the plaintiff violated was passed to obviate the necessity of considering the density of the fog.  So, too, it is impossible to say that the lack of signals from the plaintiff's boat did not contribute to the accident, there being a fog more or less dense, lying near the surface of the water.

Moreover it would seem that the plaintiff on his own story was guilty of negligence in anchoring his boat in an improper

place; and in doing nothing when he saw the steamboat coming a quarter of a mile off. Though he was anchored he had fifty feet of rope out, but he made no effort to cut the rope or to row out of danger. If a vessel is anchored in an improper place, and is run into in a fog, it cannot be said that the fact of her being so anchored did not contribute to the collision. *The Ailsa*, 76 Fed. Rep. 868. *La Bourgogne*, 30 C. C. A. 203, and 86 Fed. Rep. 475. *The Providence*, 98 Fed. Rep. 133.

Some reliance was placed by the plaintiff upon a conversation between him and one Sirovich, the wharfinger of the defendant company, while the latter was on his way to strike a triangle on Windmill Point for the purpose of guiding the steamboat when in a fog. The man in the boat with the plaintiff testified that the plaintiff cried out to Sirovich " Are we all right here? " and that Sirovich said " Yes." Sirovich testified that the plaintiff cried out, " Do you think they can see us? " and that he replied " that he thought they could, but they would n't expect anybody anchored right in the Gut." Whatever the conversation was, there was nothing in it which could bind the defendant. There was nothing to show that Sirovich could give any authority to any one to anchor in the path of the approaching steamboat, or that the plaintiff had a right to rely on Sirovich's opinion as to whether the boat could be seen.

In the view we have taken of the case, it is unnecessary to consider whether there was any evidence of negligence on the part of the steamboat.

*Exceptions sustained.*